**Andrew Lee WILLIAMS, Appellant**

**v.**

**The STATE of Texas, Appellee**

**NO. 14-16-00458-CR**

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed October 3, 2017

Crespin Michael Linton, Houston, TX, for Appellant.

Trey David Picard, Angleton, TX, for State.

Panel consists of Justices Boyce, Donovan, and Jewell.

## OPINION

John Donovan, Justice

A jury found appellant, Andrew Lee Williams, guilty of manslaughter with an affirmative finding of use of a deadly weapon and accident involving personal injury or death. *See* Tex. Penal Code § 19.04 and Tex. Transp. Code § 550.021. Punishment was enhanced with two prior felony convictions and the jury sentenced appellant to confinement in the Institutional Division of the Texas Department of Criminal Justice for sixty years for each offense; the sentences were ordered to run

concurrently. In multiple issues, appellant contends (1) the evidence was insufficient to support both of his convictions; (2) the trial court erred by denying his motion to suppress his custodial statement; (3) the trial court erred by admitting evidence of (a) drug test results, (b) extraneous offenses about drug use, and (c) improper expert testimony. We affirm.

## I. THE EVIDENCE

Around 9:00 a.m. on Saturday, December 13, 2014, the complainant, Donna Treesh, was jogging along Business State Highway 288 ("Business 288"), a main road through the town of Angleton, Texas, with at least six other people, including her daughter, Megan Gonzalez. One of the runners, Marie Silva, testified they ran on the road's shoulder. Silva was running behind Treesh and Gonzalez. She had stopped when a red car went right by her. She looked at Treesh and Gonzales, who were on the shoulder. Treesh was running "maybe two feet from the grass." Silva screamed at Treesh and Gonzalez and tried to "grab" the car. The car sped up and the brake lights did not show the brakes were applied. Silva witnessed Gonzalez being "ejected" to the right-hand side and land in the grass. She saw Treesh ejected "off the hood over the middle of the car ... about 12 feet into the air." Treesh landed about twenty feet away. Some men from the Goe Harley Davison/Kawasaki dealership ran over, crossing the road. Silva watched the car go back onto the road and continue one mile to Cemetery Road, where it turned right from the left-hand lane. According to Silva, that was the first time the brake lights were activated. She was certain the car never slowed down until it made the turn at Cemetery Road. Silva could not see who

was driving but could tell it was a man. She called 911.[1]

Megan Gonzales testified that Treesh was ahead of her "on the very closest edge where the grass and the road meet" when Gonzales passed her. Gonzalez then heard screaming and a very loud crash. As Gonzales turned, she saw red and what looked like a Pontiac symbol. Gonzales was hit and then flew through the air and slammed onto the ground. She felt her head slam on the concrete and tried to scream but the breath had been knocked out of her; Gonzalez could not move. She heard people screaming around her and thought she was going to die. Gonzales began yelling "where's my mom." She thought Treesh had been hit. Gonzalez heard someone say "the neck is severed." Gonzalez was taken to the hospital and was later told by her father that her mother had died.

That morning Christopher Petersen was working at the Goe Harley-Davidson/Kawasaki dealership on Business 288 in Angleton. He was out front and saw the joggers. Petersen described the weather as nice, not raining, with perfect visibility. The highway was not busy. Petersen noticed a red Pontiac car come up behind two of the joggers. He could not tell how fast the car was going but it was at least the speed limit of fifty or fifty-five miles per hour. The car went "way off" the road and traveled some distance before striking the two joggers. Treesh was hit "really hard" and went "flying through the air." Gonzalez was hit and rolled off the right side of the car and into the grass. The car continued to Cemetery Road where it turned right. Petersen never saw the car attempt to stop, the brake lights did not activate, and the car did not return to the scene.

---

1. The recording of Silva's 911 call was admitted into evidence as State's Exhibit 1 and played in open court.

Petersen ran across the street to Treesh—blood was coming out from underneath her head and her right ear. Petersen checked her pulse and felt "maybe three or four heartbeats" before hearing "a big exhale;" there were no more heartbeats.

Amanda Berkley was dating appellant at the time of the accident. Berkley testified that she and appellant were in Clute, Texas, on the morning of December 13, 2014. She saw appellant take three Somas, which are prescription muscle relaxants. Subsequently, they headed to Angleton in a four-door red Pontiac. Appellant became very drowsy and "started nodding off to sleep as he was driving." Berkley kept telling him to stop and let her drive but appellant refused. According to Berkley, she "was screaming at him." Berkley convinced appellant to stop for coffee and cigarettes but before they reached a convenience store, "[s]omething hit the front window." Before that, Berkley saw the group of runners on the left side of the road. Berkley did not see "the first thing" but then saw "a body roll over on the hood of the car." Appellant said "he had a warrant" and told Berkley he was not going to stop. Berkley testified that she told appellant "to drive." Berkley told appellant "we hit someone" but he kept saying, "no" and then said, "we must have hit a dog." Berkley stated that she told appellant it was not a dog, but a person. Berkley then testified that she told appellant to turn around and he said, "no, I have a warrant."

Appellant and Berkley drove to a trailer; several other people were there. Berkley overheard appellant talking to someone about a dog or a deer and disposing of the car. Berkley never heard a discussion about appellant going back or calling the police. Berkley testified that she did not believe appellant knew exactly what had happened and it was very difficult to see out of the busted windshield. Berkley admitted that she later told a friend, Debbie

Falco, that appellant was going to stop but she told him to go. Berkley said appellant was distracted "with a phone" when the accident occurred. Berkley also agreed that she told Falco that appellant was being stupid and careless.

Charlene Weber was at the trailer when appellant and Berkley arrived; she had never met him before. She witnessed appellant exit the car from the driver's side and Berkley exit from the passenger's side. Weber agreed that she gave a statement that appellant looked "high" when he arrived and testified "Amanda was for sure high. She was slurring her words and everything and like I kind of knew her cause we worked together." Two people at the trailer left and went to the scene of the accident. When they returned and spoke to appellant, he was very upset, scared and crying. Those present began discussing how to dispose of the car; Weber did not recall appellant saying anything. She admitted that she suggested burning the car. Weber later saw appellant take some pills but she did not know what kind. Weber left before the police arrived.

Weber admitted that she first told law enforcement that they said they hit a deer. Weber also admitted that she told police that Berkley said they were not going back because there was a warrant out for appellant. In her second statement to police, Weber said that both Berkley and appellant knew they hit a person and Berkley said "it was a drunk lady that had stumbled on the road." Weber then testified she did not recall who said it. Weber agreed that she, Weber, told appellant to go back.

Officer Steven Epperley of the Angleton Police Department was transporting a prisoner on the day of the accident and drove past the joggers on that part of Business 288, also called South Velasco. He described it as a clear day, the sun was out, and traffic conditions were very light.

As Epperley arrived at the department's garage, he heard over the police radio that there had been a major accident on South Velasco involving a pedestrian and the vehicle had left the scene. Epperley proceeded to the location and controlled traffic. Eventually, Epperley left the scene and went back on patrol.

Ronald Kirby received a call from his wife, Kasey (Treesh's niece), informing him of the accident. Ronald learned Treesh was hit by a red car that had turned down Cemetery Road. Ronald went to Cemetery Road and searched multiple roads. He found a red car parked next to a trailer. The car had a broken windshield and a dent in the hood. Ronald called the Angleton Police Department and reported that he had possibly found the car involved in the accident. Ronald remained nearby until the police arrived.

Epperley received instructions to proceed to Sunny Meadows in regards to the car involved in the accident. Epperley approached a trailer house with two vehicles in the driveway, one of which was a red Pontiac. On the red car, Epperley observed damage to the windshield on the driver's side as well as the hood and the passenger-side mirror was missing. Officer Jeremy Burch of the Angleton Police Department testified the car's side rearview mirror, and other debris from the car, were found at the scene of the accident.

Appellant was at the trailer and claimed ownership of the red car. When asked what happened to the car and appellant said, "I think I hit a deer." Appellant told Epperley the accident occurred by Spare Time, a bowling alley at Cemetery Road and South Velasco, approximately four city blocks from the scene of the fatality. Appellant also said he "hit something blond." Appellant stated that an acquaintance informed him that he had hit a person and it was a fatality. Appellant claimed that he did not know whether he hit a person, all he saw was a "blond" animal. Appellant said he "saw a blond deer" and saw "blond short hairs in the windshield." Epperley testified that when he observed the car closer at the police department, he saw long strands of blond human hair in the windshield. Appellant stated, "I fled the scene" and "well, damn, I know the laws." Epperley testified that appellant indicated he was aware that he was involved in an accident. Epperley also stated that appellant's train of thought was "scattered" and not in chronological order. Appellant seemed hyper and nervous and his pants appeared urine-stained.

Rodney Crisp, a detective with the Angleton Police Department, also was called to the scene of the accident. After the scene was cleared, Crisp returned to the police department and learned a vehicle matching the description of the one that left the scene was located on Sunny Meadows Road in Sunny Meadows Trailer Park. When Crisp arrived, Epperley was on the driveway talking to appellant. Crisp observed a red Pontiac Grand Am parked at the trailer. Crisp subsequently learned the vehicle was registered to appellant. Crisp walked to the front of the car and saw front-end damage consistent with having hit someone. The windshield was damaged on the driver's side and hair follicles were embedded into it.

Epperley took appellant into custody and placed him in the patrol car. Appellant was "very exhausted or tired" and fell asleep, waking up and going back to sleep several times while being transported to jail. After booking appellant, Epperley asked if he had taken any medication that morning and appellant said no. Appellant agreed to give a blood sample. Pursuant to a warrant, a sample was taken approximately five hours after Epperley first encountered appellant.

On December 18, 2014, Crisp conducted a video-taped interview of appellant. Crisp testified appellant told him that he was aware that he had hit somebody. Appellant told Crisp he heard a loud thud and decided to run. Appellant said Berkley told him to run and "they needed to get their story straight." Appellant also said that he did not know he hit someone. Appellant admitted to taking medication on the day of the crash. Appellant said that he was "messed up on crystal meth and cocaine," was in and out of consciousness, and wanted to get home to lay down. Appellant claimed that when he gained consciousness, he saw damage to the windshield. Appellant told Crisp that an acquaintance told him that he had hit a person. Appellant also said that he thought he had hit a deer when Berkley told him that he hit a person. Crisp testified that he learned that at the time of the crash, appellant knew a warrant had been issued for his arrest.

Sergeant Craig Cummings of the Texas Highway Patrol downloaded the airbag control module, also known as the "black box." He testified the device records if the airbag is deployed or if the vehicle is "jarred" enough to cause a drop in velocity of five miles per hour ("mph"). The data reflected the speed of the vehicle increased from fifty-two mph to fifty-five mph in the five seconds immediately preceding the crash. Also, the data showed the brakes were not applied immediately prior to the crash. Cummings agreed the data corroborated the eyewitness testimony that the car sped up right before the crash and the brakes were not applied. Cummings acknowledged on cross-examination that he could not say the data report was from any particular crash but it did reveal a crash date of December 13, 2014. Cummings testified the device does not record post-crash data.

Keith Woods inspected appellant's car, a red 2003 Pontiac Grand Am, on December 16, 2014. He checked the brakes, suspension, steering, exhaust and tires and found everything was in good condition. The windshield was caved in on the driver's side. Because of the windshield, the wipers did not properly operate. Woods testified the condition of the car did not contribute to the crash.

Robin Wright, an accident reconstructionist, testified the vehicle was going fifty-five mph in the seconds immediately before the crash, and was accelerating. A reduction in velocity of 1.66 mph occurred and was consistent with an auto-pedestrian crash. Further, Wright testified there was no perception and reaction—the driver "never quit depressing the accelerator. He never touched the brakes. And as a matter of fact, the speed on the vehicle was in the process of increasing as opposed to decreasing." Wright opined the cause of the crash was the driver steering off the main lane onto the road's shoulder without stopping or turning away from the pedestrians on the shoulder. Wright stated that he had no reason to suspect the crash was due to any factor other than appellant. Wright characterized appellant's conduct as a gross deviation from the general standard of care. Wright testified visibility under the conditions at the time of the crash would be "almost unlimited ...." He agreed that a driver exercising ordinary and prudent care would be able to see the joggers from half a mile, or further, away.

Dr. Lee Ann Grossberg, M.D., a forensic pathologist testified as to the cause and manner of Treesh's death. Grossberg described Treesh's multiple injuries in detail and testified the cause of death was blunt force trauma. According to Grossberg, Treesh appeared to be in excellent health before the crash. Grossberg saw no evidence of medical intervention. Treesh was pronounced dead at the scene at 9:14 a.m. Grossberg testified Treesh died "quite im-

mediately," although not "the split second of the impact." Grossberg agreed that Petersen's testimony that Treesh had a faint pulse and made a gurgling noise was consistent with her injuries. In Grossberg's opinion, no medical intervention could have saved Treesh.

Dr. Sam Wylie, Ph.D., from the Brazoria County Crime Lab testified to the results of appellant's blood test. The screening test detected THC, the psychoactive ingredient in marijuana. Also detected was meprobamate, a metabolite of Soma or carisoprodol, which is a muscle relaxant that affects the central nervous system. Wylie testified it can cause drowsiness or dizziness and is generally described as a depressant. Further testing done by NMS Laboratory found both stimulants and antidepressants in appellant's blood: amphetamine; methamphetamine; delta THC, carboxy THC; benzoylecgonine, a metabolite of cocaine; hydrocodone; carisoprodol and meprobamate.

The jury found appellant guilty of manslaughter and accident involving personal injury or death and sentenced him to prison for sixty years. From those convictions, appellant brings this appeal.

## II. SUFFICIENCY OF THE EVIDENCE

■ In his first and second issues, appellant argues the evidence presented at trial was insufficient to support both his convictions. When engaging in a review of the legal sufficiency of the evidence supporting a conviction, we "examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Price v. State*, 456 S.W.3d 342, 347 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). All evidence presented to the jury is

considered, whether properly or improperly admitted at trial. *Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988).

■ As the reviewing court, we may not substitute our judgment for that of the fact finder by re-evaluating weight and credibility of evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

### A. Manslaughter

■ A person commits manslaughter if he recklessly causes the death of an individual. *See* Tex. Penal Code § 19.04(a). A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id.* § 6.03(c). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise as viewed from the defendant's standpoint. *Id.*

Appellant contends Treesh's death was an accident caused by a momentary loss of control due to distraction within the vehicle. Appellant argues the State failed to prove beyond a reasonable doubt that he recklessly caused Treesh's death.

■ The jury was instructed that it could find appellant guilty of recklessly causing Treesh's death by several means: (1) leaving the roadway in his car and traveling onto the shoulder of the road, (2) driving his car on the shoulder of a roadway, (3) driving his car at an unsafe speed for road conditions and road shoulder conditions, (4) failing to maintain a proper lookout and avoid hitting Treesh with his car, (5) failing to properly steer and apply

brakes, causing his car to collide with Treesh, or (6) driving a car after ingesting drugs, such as methamphetamine, amphetamine, hydrocodone, carisoprodol, marijuana, and cocaine. Because alternatives means for committing manslaughter were submitted to the jury, proof of any one alternative means is sufficient for conviction. *Williams v. State*, 473 S.W.3d 319, 324 (Tex. App.—Houston [14th Dist.] 2014, pet ref'd) (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). Also, when the jury returns a general guilty verdict on an indictment presenting alternative theories of the same offense, as in this case, the verdict stands if the evidence supports one of the theories charged. *Brooks v. State*, 990 S.W.2d 278, 283 (Tex. Crim. App. 1999).

The evidence at trial was sufficient to support all of the alternatives presented to the jury with the sole exception of driving at an unsafe speed. The testimony was uncontested that Treesh was on the shoulder when struck by appellant's car. Thus the evidence was sufficient for a rational trier of fact to find appellant left the roadway and travelled onto the shoulder of the road and drove his car on the shoulder.

Further, the evidence at trial was uncontested the weather was clear, traffic was light, and visibility was excellent; the joggers were clearly visible to witnesses before and after the accident. Accordingly, a rational trier of fact could find from the evidence that appellant failed to maintain a proper lookout and avoid hitting Treesh with his car.

The undisputed evidence was that appellant left the roadway, drove onto the shoulder toward a group of joggers, and his car was accelerating. The testimony established appellant never applied the brakes. From this evidence, a rational trier of fact could find appellant failed to properly steer and brake to avoid hitting Treesh.

■ Lastly, the jury heard evidence that appellant ingested carisoprodol, in the form of Soma, and then decided to drive his car. Within hours of the crash, his blood contained methamphetamine, amphetamine, hydrocodone, marijuana, and cocaine. The only evidence appellant may have ingested drugs after the crash was the testimony of Weber that he took some unidentified pills. Appellant claimed he had used cocaine and methamphetamines one to two days before the crash, but admitted to taking prescription medication that morning. Rational jurors could have found beyond a reasonable doubt that the drugs found in appellant's system were present before he began to drive the car that morning. Proof that appellant was driving after having ingested controlled substances is sufficient to show recklessness. *See Rubio v. State*, 203 S.W.3d 448, 452 (Tex. App.—El Paso 2006, pet. ref'd) (holding that driving under the influence of alcohol demonstrates a conscious disregard of substantial risk).

Appellant argues "not every accident is felony crime" and "it would have been an accident if [he] had stopped." This is incorrect. From the evidence presented, a rational trier of fact could have found appellant's recklessness caused Treesh's death regardless of whether he stopped the car.

■ The evidence suggesting appellant was unaware of what he hit and his claim that he was distracted do not render the evidence insufficient to support his conviction. In regards to the manslaughter conviction, the question is not whether appellant knew he hit Treesh but whether his reckless driving caused her death. Recklessness can be applied generally to the act of driving. *Porter v. State*, 969 S.W.2d 60, 63 (Tex. App.—Austin 1998, pet. ref'd). The major factor to be considered is the conscious disregard of the risk *created* by the actor's conduct. *See Lewis v. State*, 529

S.W.2d 550, 553 (Tex. Crim. App. 1975) (emphasis added).

The evidence before the jury was that appellant chose to drive after ingesting three muscle relaxants and continued to drive even though he was losing consciousness. From this was evidence, a rational juror could find beyond a reasonable doubt that appellant consciously created a substantial and unjustifiable risk of danger to others. *See Rodriguez v. State*, 834 S.W.2d 488, 490 (Tex. App.—Corpus Christi 1992, no pet.). For these reasons, we find the evidence sufficient to support appellant's conviction for manslaughter and overrule his first issue.

## B.  Accident Involving Death

■  Appellant contends in his second issue that the evidence was insufficient to support his conviction for accident involving personal injury or death. Section 550.021(c) of the Texas Transportation Code defines the offense of accident involving personal injury or death, also known as failure to stop and render aid. *See* Tex. Trans. Code § 550.021(c); *see also Steen v. State*, 640 S.W.2d 912 (Tex. Crim. App. 1982). The requirements of section 550.021 are found in subsection (a) of the statute, which provides:

> The operator of a vehicle involved in an accident that results or is reasonably likely to result in injury to or death of a person shall:
>
> (1)  immediately stop the vehicle at the scene of the accident or as close to the scene as possible;
>
> (2)  immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident;
>
> (3)  immediately determine whether a person is involved in the accident, and if a person is involved in the accident, whether that person requires aid; and

> (4)  remain at the scene of the accident until the operator complies with the requirements of Section 550.023.

Tex. Trans. Code § 550.021(a). Section 550.023 provides:

> The operator of a vehicle involved in an accident resulting in the injury or death of a person or damage to a vehicle that is driven or attended by a person shall:
>
> (1)  give the operator's name and address, the registration number of the vehicle the operator was driving, and the name of the operator's motor vehicle liability insurer to any person injured or the operator or occupant of or person attending a vehicle involved in the collision;
>
> (2)  if requested and available, show the operator's driver's license to a person described by Subdivision (1); and
>
> (3)  provide any person injured in the accident reasonable assistance, including transporting or making arrangements for transporting the person to a physician or hospital for medical treatment if it is apparent that treatment is necessary, or if the injured person requests the transportation.

Tex. Trans. Code § 550.023.

Based upon subsection (3) of section 550.023, and the testimony of Dr. Grossberg that "no medical intervention could have saved [Treesh's] life," appellant argues the State failed to show that he could have rendered aid to Treesh since she died immediately after impact. Appellant relies upon the allegation in the indictment that he left the scene of an accident "without rendering reasonable assistance to Donna Treesh when it was then apparent Donna Treesh was in need of medical treatment and said accident resulted in the death of Donna Treesh."

Appellant admitted that he was aware he had hit something, and that a loud thud woke him after he passed out while driving. Additionally, he informed police that his passenger told him he hit a person and he then fled the scene. Appellant thus violated section 550.022 in the following ways:

- He did not stop the vehicle at the scene of the accident;
- He did not return to the scene of the accident;
- He made no attempt to determine if a person was involved in the accident or required aid; and
- He did not remain at the scene and comply with section 550.023.

Sections 550.021 and 550.023 do not require that the life of the injured person could have been saved. Such a requirement would be inapposite to section 550.021's express allowance for a conviction whether the accident results, or is reasonably likely to result, *in injury to* or death of a person. Moreover, section 550.021 does not require that injury or death did, in fact, result from the accident, only that it was *reasonably likely* to result. And section 550.023 requires a person to *provide* reasonable assistance without mandating that assistance be successful.

▆▆▆▆ The primary concern of the statute is leaving the scene of an accident with knowledge that an accident has occurred. *Huffman v. State*, 267 S.W.3d 902, 908 (Tex. Crim. App. 2008); *see also Mayer v. State*, 494 S.W.3d 844, 851 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). The allegation of failure to stop and render aid is complete after it is determined the operator of the vehicle was aware he was in an accident and failed to stop. *See May v. State*, 146 Tex.Crim. 115, 171 S.W.2d 488, 490–91 (1943) (affirming a conviction for failure to stop and render aid after the defendant failed to stop at accident, de-

spite evidence that the victim was "beyond all earthly aid.").

When appellant's windshield was caved in, he was aware he was in an accident. Appellant then failed to comply with section 550.022. Accordingly, the offense was complete. From that evidence, the jury could have found beyond a reasonable doubt that appellant was guilty of accident involving personal injury or death. Accordingly, appellant's second issue is overruled.

### III. MOTION TO SUPPRESS

▆▆▆▆ In his third issue, appellant contends the trial court erred in denying his motion to suppress the video statement he gave on December 18, 2014, to Detective Crisp while in custody. Appellant alleges it was obtained in violation of his Fifth and Sixth Amendment right to counsel because an attorney had been appointed to represent him two days earlier.

▆▆▆▆ When reviewing a trial court's decision on a motion to suppress regarding a custodial interrogation, we must conduct a bifurcated review. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). We afford almost total deference to the trial judge's rulings on questions of historical fact and credibility, and review de novo only the trial court's rulings on application of law to fact questions that do not turn upon credibility and demeanor. *Id.* The evidence presented on a motion to suppress is viewed in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We will affirm the trial court's ruling if it is correct under any theory of law applicable to the case. *Id.* at 855–56.

During the motion to suppress hearing, appellant based his argument on the fact that the interview was initiated and conducted by Detective Crisp two days after he requested and was appointed counsel at the magistrate hearing. Appellant asserted

that by requesting counsel at the magistrate hearing, any subsequent waiver or discussion outside the presence of his attorney was involuntary. Appellant re-urged his objection prior to Crisp's testimony and admission of his statement into evidence.

The trial court found that before the interview and during the video recording, Crisp read appellant his *Miranda* [2] rights. The trial court further concluded the evidence demonstrated appellant knowingly and intelligently waived his *Miranda* rights and his statement was voluntarily and freely given. As a result, the trial court denied the motion to suppress, stating there was no violation of appellant's Fifth or Sixth Amendment rights. We agree.

The Fifth Amendment protects a criminal defendant from being forced to bear witness against himself. U.S. CONST. amend. V. The *Miranda* rule was intended to protect a defendant against the coercive nature of police questioning and ensure that his Fifth Amendment right is safeguarded. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). Police are required to provide *Miranda* warnings prior to the start of interrogation and once a defendant has invoked his right, questioning must stop. *Id.*

The Sixth Amendment functions similarly to that of the Fifth Amendment. Once the adversarial judicial process begins, the Sixth Amendment guarantees the defendant the right to have counsel present in all critical stages. *Hughen v. State*, 297 S.W.3d 330, 334 (Tex. Crim. App. 2009) (internal citations omitted). Police questioning, while in custody, has been considered to be a "critical stage" of the criminal proceedings protected by Sixth Amendment. *Id.*

Though the *Miranda* doctrine was developed to offer additional protections under the Fifth Amendment, these warnings also serve the interests of the Sixth Amendment right to counsel during interrogation. *See Pecina v. State*, 361 S.W.3d 68, 77 (Tex. Crim. App. 2012) (citing *Montejo v. Louisiana*, 556 U.S. 778, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009)). Therefore, waiver of *Miranda* rights constitutes a waiver of both Fifth and Sixth Amendment right to counsel, so long as the relinquishment is voluntary, knowing, and intelligent. *See id.* at 77–80; Tex. Code Crim. Proc., art. 38.22 § 2 (b).

Appellant contends that because he invoked his right to counsel at the magistrate hearing, his constitutional right to counsel was violated two days later when Crisp initiated interrogation without notification to and presence of defense counsel. This is no longer the state of the law. *See, e.g., Holloway v. State*, 780 S.W.2d 787, 795 (Tex. Crim. App. 1989) (determining authorities may only initiate interrogation of a charged and represented defendant through notice to defense counsel); *Cloer v. State*, 88 S.W.3d 285, 289 (Tex. App.—San Antonio 2002, no pet.) (concluding detective was prohibited from interviewing defendant without notifying counsel first).

In *Montejo*, the United States Supreme Court expressly overruled the holding in *Michigan v. Jackson*, 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), which barred interrogations initiated by police after a defendant's request for a lawyer at arraignment. *Montejo*, 556 U.S. at 797, 129 S.Ct. at 2091. Under *Montejo*, appellant's request for counsel at an arraignment has no effect on the invocation of his right to counsel during later police-initiated custodial interrogation. *See Pecina*, 361 S.W.3d at 78.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In an attempt to distinguish his case, appellant argues that he requested counsel, whereas Montejo did not. In *Montejo*, the Court appointed counsel to represent the defendant from the Office of Indigent Defenders. *Montejo*, 556 U.S. at 782, 129 S.Ct. at 2082. However, in dicta the Supreme Court discussed how different State practices of appointment of counsel in situations of indigence played a part in its decision to overrule the *Jackson* rule as unworkable. *See* 556 U.S. at 783–84, 129 S.Ct. at 2083–84. Hence, it declined to permit inconsistent application of the rule for one defendant who was instructed to request appointment than for one who was directly appointed counsel by the court, calling the difference "hollow formalism." *Id.* As such, the distinction raised by appellant is irrelevant.

Appellant also contends the holding in *Pecina* is inapplicable because Pecina asked to speak with the police immediately after he requested appointment of an attorney. This is a mischaracterization of the facts of *Pecina*. In response to being asked by the Magistrate Judge if he wanted to talk to police, who were waiting outside his hospital room, Pecina indicated he did. *Pecina*, 361 S.W.3d at 72. He did not initiate the contact, as appellant's argument suggests. *Id.* at 73 (citing *Pecina v. State*, 268 S.W.3d 564, 568 (Tex. Crim. App. 2008), in which the Court previously decided that Pecina had not initiated contact). The temporal distinction does not change the fact that in this case appellant was informed of his rights during interrogation and failed to request counsel when he had the opportunity.

▮ Because appellant's request for counsel at a magistrate hearing does not translate to the time of questioning, we must next determine if his waiver given to Crisp was valid. While being questioned, police recorded appellant's statement on video. Crisp read appellant the *Miranda*

warnings, which also comported with the standards of Texas Code of Criminal Procedure, art. 38.22, § 2 (a). As appellant was informed of his right to have a lawyer present during interrogation, appellant nodded, indicating he understood. Further, in response to being asked if he wanted to talk to the detective, appellant responded, "yes sir, I have no reason not to." There is no evidence that appellant was forced to provide, or promised anything in exchange for, his statement. Thus the record supports the trial court's finding that appellant's statement was voluntarily, freely, and intelligently given, making the waiver of his right to counsel valid.

For these reasons we conclude the trial court did not abuse its discretion in denying appellant's motion to suppress his custodial statement. Accordingly, appellant's third issue is overruled.

## IV. ADMISSIBILITY OF EVIDENCE

▮ In points of error four through six, appellant contends the trial court erred by (1) admitting evidence of drug test results; (2) admitting evidence of extraneous offenses; and (3) admitting expert testimony that he acted recklessly. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). As long as the trial court's ruling falls within the zone of reasonable disagreement, we will affirm its decision. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We address each complaint in turn.

### A. Admission of Drug Test Results

▮ In his fourth issue, appellant contends the trial court abused its discretion by admitting into evidence the results of his drug tests, accompanied by a Certificate of Analysis, without the testimony of

the chemist who performed the testing. *See* Tex. Code Crim. Proc. art. 38.41. Appellant argues admission of the results of blood tests performed by NMS Laboratory violated his right to confrontation under the Sixth Amendment to the United States Constitution. *See* U.S. Const. amend. VI. The Confrontation Clause provides the accused in a criminal prosecution the right to be confronted by the witnesses against him. *Id.* This procedure bars testimonial statements of a witness not present at trial, unless the witness is unavailable or the defendant had a previous opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004). Affidavits that show the results of a forensic analysis, such as drug tests or DNA comparisons, are considered testimonial statements under the Sixth Amendment right to confrontation. *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 310, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314 (2009); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 665, 131 S.Ct. 2705, 2717, 180 L.Ed.2d 610 (2011).

However, the Sixth Amendment right to confrontation may be waived by failure to object to the offending evidence. *Melendez-Diaz*, 557 U.S. at 314, 129 S.Ct. at 2534, n. 3. States are allowed to adopt notice-and-demand statutes requiring the prosecution to provide notice to the defendant of its intent to use an analyst's report at trial without the witness present and allow the defense to object within a given period of time. *Id.* at 327, 129 S.Ct. at 2541.

Texas' notice-and-demand statute for a Certificate of Analysis is codified in article 38.41. *See* Tex. Code Crim. Proc. art. 38.41. Certificates of Analysis of physical evidence conducted by or for a law enforcement agency are admissible without the certifying analyst testifying at trial, so long as they are filed and served on the opposing party more than twenty days before trial begins. *Id.* art. 38.41 § 4. The defendant must file a written objection to the use of the evidence no later than ten days before the start of trial, or the confrontation clause objection is waived. *Id.*; *Deener v. State*, 214 S.W.3d 522, 526 (Tex. App.—Dallas 2006, pet. ref'd).

Appellant objected to admission of the Certificate of Analysis report under article 38.41 at trial, arguing the statute requires the certifying analyst be the one who conducted the tests. In this case, the Certificate of Analysis only shows that the affiant, Wendy Adams, reviewed the data and does not support that she conducted any of the tests or analysis on the sample of appellant's blood. Therefore, appellant alleged, it did not qualify under the statute for exemption from the *Crawford* rule and he was not required to object within the ten-day allotment.

While the example affidavit form provided in section 5 of the statute does include a portion that states, "I conducted the following tests or procedures on the physical evidence," the section also states that a form that "otherwise substantially complies with this article" is sufficient. *See* Tex. Code Crim. Proc. art. 38.41 § 5. Absent a more specific requirement in the statute that the affiant be the certifying analyst, the Certificate of Analysis substantially complies with the requirements of article 38.41. *See Lopez v. State*, No. 08-10-00285-CR, 2012 WL 1658679, at *4 (Tex. App.—El Paso May 9, 2012, no pet.) (mem. op., not designated for publication) (certificate substantially complied with statute despite it failing to include a statement that the tests or procedures used were reliable); *Johnson v. State*, No. 07-07-0327-CR, 2009 WL 102930, at *6 (Tex. App.—Amarillo Jan. 15, 2009, no pet.) (mem. op., not designated for publication) (a certificate of analysis lacking a statement of accreditation by nationally recog-

nized association still substantially complied with the statute).

Because the Certificate of Analysis substantially complied with the statute, appellant was required to file a written objection at least ten days before the beginning of trial. He had ample time to do so, as the State filed the Certificate of Analysis on March 14, 2016, and trial did not commence until May 2, 2016. Additionally, the State had included the analysts who performed the tests on its witness list, in anticipation of a possible objection by appellant. If appellant had wanted to confront the analysts from NMS Laboratory, he could have done so by filing a written objection.

By failing to timely file a written objection to the Certificate of Analysis, appellant failed to preserve the issue for our review. *See Deener*, 214 S.W.3d at 528. Appellant's fourth issue is therefore overruled.

## B. Extraneous Offenses

In his fifth issue, appellant asserts the trial court erred by admitting evidence of extraneous offenses. Specifically, appellant complains of the evidence of his drug use in the days immediately preceding and the day of the crash. Appellant objected to the evidence of these extraneous offenses because they were irrelevant—since he was not charged with intoxication manslaughter—and the evidence was more prejudicial than probative. *See* Tex. Penal Code § 49.08 (setting forth the offense of intoxication manslaughter); Tex. R. Evid. 401, 402, 403, and 404(b).

The admissibility of evidence is within the discretion of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We uphold the trial court's evidentiary ruling as long as it was within the zone of reasonable disagreement. *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on

reh'g)). We cannot simply substitute our own decision for the trial court's and should reverse only for a clear abuse of discretion. *See id.*

Generally, extraneous offense evidence that does not have relevance apart from character conformity is inadmissible during the guilt/innocence phase of trial. Tex. R. Evid. 404(b). However, such evidence is admissible when the extraneous act is: (1) relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character, and (2) its probative value is not substantially outweighed by the danger of unfair prejudice. *Hedrick v. State*, 473 S.W.3d 824, 829 (Tex. App.—Houston [14th Dist.] 2015, no pet.). We defer to the trial court's determinations of whether extraneous evidence has relevance apart from character conformity and whether the probative value is substantially outweighed by the danger of unfair prejudice. *See Moses*, 105 S.W.3d at 627.

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action. Tex. R. Evid. 401. Even if the extraneous evidence is relevant, the trial court may properly exclude it under rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. 403. "When Rule 403 provides that evidence 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,' it simply means that trial courts should favor admission in close cases, in keeping with the presumption of admissibility of relevant evidence." *Montgomery*, 810 S.W.2d at 389.

Appellant contends that because he was not charged with intoxication manslaughter, the evidence of his drug use was not relevant and constituted an extraneous offense. An extraneous offense is any act of misconduct, whether prosecuted or not, that is *not shown in the charging papers. Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003) (emphasis added).

The indictment in this case alleged six means by which appellant acted recklessly, one of which was "driving a motor vehicle after ingesting drugs and by driving a motor vehicle with methamphetamine, amphetamine, hydrocodone, carisoprodol, marijuana, and cocaine in [his] body." Thus the evidence of appellant's drug use on the day of the crash and within one or two days of the crash did not constitute an extraneous offense, *see Manning*, 114 S.W.3d at 927, and was clearly relevant to the charged offense.

Moreover, even if appellant's drug use were an extraneous offense, such evidence may be admissible for other purposes besides character conformity. Tex. R. Evid. 404(b). Rebuttal of a defensive theory is one of these "other purposes." *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see also Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (stating that "other purposes" includes rebutting the defensive theory that a complainant fabricated her allegations against defendant). Evidence that the crash was caused by appellant ingesting drugs before driving rebutted his defensive theory that the crash was caused by "distraction" and was an unfortunate accident that should not have been criminalized; *e.g.*, that he was not driving recklessly. *Hedrick*, 473 S.W.3d at 832. Thus it was admissible under Rule 404(b).

We next address whether the probative value of the extraneous offense evidence substantially outweighs the danger of unfair prejudice, beginning with the presumption that it does. *Montgomery*, 810 at 389; *Grant v. State*, 475 S.W.3d 409, 420–21 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). It is the defendant's burden to demonstrate that the danger of unfair prejudice substantially outweighs the probative value. *Id.*; *Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In reviewing trial courts' balancing determinations under Rule 403, we reverse only rarely and upon a clear demonstration of abuse of discretion. *Id.*

The following factors are considered relevant to the analysis under Rule 403: (1) the strength of the evidence in making a fact more or less probable; (2) the potential of the extraneous offense evidence to impress the jury in some irrational but indelible way; (3) the amount of time the proponent needed to develop the evidence; and (4) the strength of the proponent's need for the evidence to prove a fact of consequence. *Grant*, 475 S.W.3d at 420–21; *Bargas v. State*, 252 S.W.3d 876, 892–93 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

The first factor weighs strongly in favor of admissibility because the evidence was relevant to establish recklessness and rebut appellant's defensive theory. *See id.* As set forth above, one of the means by which appellant drove recklessly, as alleged by the State, was that he drove after ingesting drugs. The evidence directly contradicted appellant's theory that the accident was not caused by his reckless driving.

The second and third factors also weigh in favor of admissibility. The extraneous offenses were far less inflammatory than the crime for which appellant was indicted, so the testimony was not likely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose. *See Taylor v. State*, 920 S.W.2d

319, 323 (Tex. Crim. App. 1996). Any danger the testimony may have impressed the jury in a prejudicial way is overshadowed by its probative value. *See Bargas*, 252 S.W.3d at 893 (viewing prejudicial tendencies of extraneous-offense testimony in sexual assault case as outweighed by its probative value when it was used to rebut a defensive issue). Furthermore, the complained-of testimony was adduced from two of the State's thirteen witnesses, in addition to appellant's own statement, in the course the four-day guilt-innocence proceedings.

The State's need for this testimony was also significant, favoring admissibility under the fourth factor. As noted above, this evidence discredits appellant's theory that the crash was an accident for which he should not be held responsible.

Considering the above factors, we conclude the probative value of the extraneous-offense evidence was not substantially outweighed by unfair prejudice. The evidence was probative in assessing whether appellant was driving recklessly and the State needed the evidence to counteract the defensive theory that he was not. We conclude that under Rule 403 the trial court did not abuse its discretion in admitting the evidence. *See Bargas*, 252 S.W.3d at 893; *see also Montgomery*, 810 S.W.2d at 391–92. Appellant's fifth issue is overruled.

## C. Expert Testimony of Recklessness

In his sixth issue, appellant claims that Wright's expert testimony was inadmissible pursuant to Texas Rule of Evidence 702, because Wright's opinion pertained to a pure question of law. We disagree.

Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702. A party may challenge expert testimony on at least three specific grounds: (1) qualification, (2) reliability, and (3) relevance. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). The three requirements raise distinct questions and issues, and an objection based on one of these requirements does not preserve error as to another. *Turner v. State*, 252 S.W.3d 571, 584 n. 5 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (holding that an objection based on the expert's qualifications did not preserve the reliability issue). As such, if a party objects to expert testimony without identifying one or more of these issues, no error is preserved for our review. *Shaw v. State*, 329 S.W.3d 645, 655 (Tex. App.— Houston [14th Dist.] 2010, pet. ref'd). In addition, an expert's opinion may not be objected to solely because it encompasses an ultimate issue. *See* Tex. R. Evid. 704.

In a *Daubert* [3] hearing outside the presence of the jury, appellant objected to allowing Wright to discuss appellant's mental culpability for the offense of manslaughter. More specifically, appellant argued the expert was not permitted to discuss whether he was "reckless" since that would invade the province of the jury as an ultimate issue of law. During Wright's testimony, appellant reiterated his objection under Rules 701, 702, and 704.

On appeal, appellant does not specifically state which of the three prongs under Rule 702 he is challenging and does not

---

**3.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

address the Rule 701 or 704 objections. As we understand appellant's argument from the context of his brief, he is arguing on appeal that Wright lacked the necessary qualifications to testify that appellant drove recklessly, as that is a mental state defined by statute.

■ A party may allege he witness does not qualify as an expert because the witness lacks the requisite knowledge, skill, experience, training, or education in the subject matter of the expert's testimony. *Vela*, 209 S.W.3d at 131; *see* Tex. R. Evid. 702. In the *Daubert* hearing, appellant agreed to allow Wright to testify as an accident reconstructionist. By doing so, he stipulated that Wright had the necessary knowledge, skills, experience, training, or education to discuss the incident.

■ Appellant's primary ground for his objection is therefore that the expert is testifying to a pure question of law. An expert witness may not testify to his opinion on a pure question of law. *Anderson v. State*, 193 S.W.3d 34, 38 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). However, an expert witness may state an opinion on a mixed question of law and fact, as long as the opinion is confined to the relevant issues and is based on proper legal concepts. *Blumenstetter v. State*, 135 S.W.3d 234, 248 (Tex. App.—Texarkana 2004, no pet.) (internal citations omitted). "[A] mixed question of law and fact [is] one in which a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard." *Id.* The relevant expert testimony adduced at trial is as follows:

> Q. [State]: And after reviewing the evidence in this case, do you have an opinion as to whether the conduct of the driver in this case, the defendant, consciously disregarded a substantial and unjustifiable risk and was a gross deviation from the normal standard of care in this case?

MR. ROBINSON [Appellant counsel]: I object, Your Honor. And I ask that I be allowed to ask this witness some questions.

THE COURT: You may.

[Voir Dire Examination]

. . . .

Q. [State]: Okay. And based on all of those factors and your review of everything and in your expert opinion, did the defendant's conduct in this case comport with the general standard of care that we expect of operators of motor vehicles?

A. [Wright]: No, sir. It did not.

Q. [State]: Are you telling us that it constituted a deviation from the general standard of care?

A. [Wright]: Yes.

Q. [State]: Okay. And would you characterize it in your opinion as a gross deviation?

A. [Wright]: Yes, I would.

The State asked Wright for his opinion as to whether appellant "consciously disregarded a substantial and unjustifiable risk." Wright did not answer that question because appellant objected, and the State did not repeat it.

Wright was then asked if appellant's operation of his car was a "gross deviation" from the normal standard of care. This question constitutes a mixed question of law and fact because it asks Wright to opine whether the facts and circumstances revealed by his investigation measure up to a standard of legal culpability. *See Blanchard v. State*, No. 02-11-00267-CR, 2013 WL 1759905, at *8 (Tex. App.—Dallas Apr. 25, 2013, no pet.) (mem. op., not designated for publication). Wright was not asked to give his opinion on a pure question of law, such as whether appellant committed manslaughter. Accordingly, we

determine the trial court did not abuse its discretion.

Moreover, any error in admitting Wright's expert opinion was harmless. *See Humaran v. State*, 478 S.W.3d 887, 905 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (court held that admission of expert's testimony was harmless error, if any, because it had no effect on the jury's verdict). Under the applicable standard for nonconstitutional error, we must disregard the trial court's error, if any, unless we determine it affected a defendant's substantial rights. *Id.*; Tex. R. App. P. 44.2(b). A defendant's substantial rights are affected when the error has a substantial and injurious effect or influence on the jury's verdict. *Id.* If the error had no or only a slight influence on the verdict, the error is harmless. *Id.*

Irrespective of Wright's testimony, the State provided ample evidence from which the jury could find appellant was driving recklessly. As noted above, several eyewitnesses testified appellant was driving on the shoulder when he hit Treesh. Appellant admitted to ingesting medication and being in and out of consciousness while driving. Berkely testified appellant lost consciousness at least once before the accident. Accordingly, any error in admitting Wright's opinion that appellant was reckless did not affect appellant's substantial rights. For these reasons, appellant's sixth issue is overruled.

## V. CONCLUSION

Having overruled all of appellant's issues, the judgment of the trial court is affirmed.